IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 24-cv-01635-PAB-STV

OLGA SUGEY CENTENO AGUIRRE,

     Petitioner,

v.

FRANCESCO GIOVANNI BARCO HERNANDEZ,

     Respondent.

---

## ORDER

---

This matter is before the Court on the Complaint and Petition for Return of Children [Docket No. 1]. The Court held an evidentiary hearing on September 11, 2024. Docket No. 40. Both parties presented testimony and introduced exhibits.[1] The Court has jurisdiction pursuant to 22 U.S.C. § 9003(a) and 28 U.S.C. § 1331.

---

[1] At the hearing, both parties introduced exhibits which contained text messages between petitioner and respondent and other documents that are written in Spanish. Neither party tendered certified translations of these exhibits. The parties agreed to submit certified translations of these exhibits, which were filed on September 12, 2024. Docket Nos. 41-1, 41-2, 41-3, 41-4, 41-5, 41-6, 41-7, 41-8, 41-9, 41-10, 41-11, 41-12. The Court finds that these translations have been certified and authenticated and the Court will, as agreed by the parties, admit them as evidence for purposes of the hearing. *See Suchite v. ABM Aviation, Inc.*, 2024 WL 3498498, at *2 (S.D. Cal. July 22, 2024) ("witness testimony translated from a foreign language must be properly authenticated and any interpretation must be shown to be an accurate translation done by a competent translator" (citation and alterations omitted)).

I.    **BACKGROUND**

   A.   <u>**The Hague Convention**</u>

The purpose of the Hague Convention on the Civil Aspects of International Child Abduction, *opened for signature* Oct. 25, 1980, T.I.A.S. 11,670 (hereinafter "Hague Convention" or "Convention"), as well as its corresponding United States law, the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. §§ 9001 et seq., is to prevent parents from abducting their children in order to avoid unfavorable custody decisions in the children's country of habitual residence.  *Livingstone v. Livingstone*, 2023 WL 8524922, at *1 (10th Cir. Dec. 8, 2023) (citing *Shealy v. Shealy*, 295 F.3d 1117, 1121 (10th Cir. 2002)).  "Generally, the Hague Convention creates an international legal mechanism requiring contracting states to promptly return children who have been wrongfully removed to, or wrongfully retained in, their jurisdiction, without deciding anew the issue of custody."  *Id.* (citing *Navani v. Shahani*, 496 F.3d 1121, 1124 (10th Cir. 2007) (brackets omitted)).  ICARA provides federal district courts with original jurisdiction over petitions seeking the return of children pursuant to the Hague Convention.  22 U.S.C. § 9003(a).

A prima facie case of wrongful removal under the Hague Convention requires that a petitioner establish "(1) the child was habitually resident in a given state at the time of the removal or retention; (2) the removal or retention was in breach of petitioner's custody rights under the laws of that state; and (3) petitioner was exercising those rights at the time of removal or retention."  *Ogawa v. Kang*, 946 F.3d 1176, 1179 (10th Cir. 2020) (quotation omitted); *see also* Hague Convention, art. 3.

Even if a removal is deemed unlawful, children are not required to return to the country of habitual residence if "one of the affirmative defenses or narrow exceptions

set forth in the Convention" applies. *Livingstone*, 2023 WL 8524922, at *2 (citing *West v. Dobrev*, 735 F.3d 921, 931 (10th Cir. 2013)). These defenses include: (1) the proceeding was commenced more than one year after the child's retention and the child has become settled in his or her new environment, *see* Hague Convention, art. 12; (2) the parent seeking the return of the child either consented to or subsequently acquiesced in the retention, *id.*, art. 13; (3) there is a grave risk that the return of the child would expose the child to physical or psychological harm, *id.*, art. 13(b); and (4) "the return of the child[] would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms." *See Gil-Leyva v. Leslie*, No. 17-CV-01406-KLM, 2018 WL 10322064, at *4 (D. Colo. Apr. 17, 2018), *aff'd*, 780 F. App'x 580 (10th Cir. 2019) (unpublished).

   **B. Factual Background[2]**

   Petitioner Olga Sugey Centeno Aguirre and respondent Francesco Giovanni Barco Hernandez are the parents of A.B.C. and F.B.C., both boys. A.B.C. is twelve years old. F.B.C. is seven years old. Both A.B.C. and F.B.C. were born in Costa Rica and are citizens of Costa Rica and Italy. *See* Docket Nos. 34-3, 34-4. Ms. Centeno is married to Mr. Barco. Docket No. 34-5. Although Ms. Centeno and Mr. Barco remain married, the two no longer have a romantic relationship, and both have asked the other for a divorce at different times. *See, e.g.*, Docket No. 41-8 at 1.

---

[2] These facts are taken from the testimony at the September 11, 2024 hearing and from exhibits admitted into evidence. The Court recites only those facts that are material to the Court's analysis.

A.B.C. was born with anemia and has been seen by doctors every few months since he was born.[3]  A.B.C. has ADHD.  F.B.C. is autistic.[4]  Docket No. 41-11 at 9.

Five years ago, Mr. Barco left Costa Rica to live in the United States and settled in Colorado.  After Mr. Barco left for the United States, A.B.C. and F.B.C. lived with Ms. Centeno, who was their primary care provider.  Mr. Barco has refugee status in the United States and cannot leave the country.

In November 2022, Ms. Centeno traveled to Toronto, Canada to start a new life for herself and the children.  Ms. Centeno found employment as a construction painter. She went to Toronto alone, but brought the children to Toronto after eight months.  Ms. Centeno chose to move to Canada because Costa Rica would not be able to accommodate her children's ability challenges, whereas Canada offered them greater opportunities.  Ms. Centeno and Mr. Barco agreed to the children moving to Toronto with Ms. Centeno.  Ms. Centeno bought the children new clothing, which was necessary because of the difference in climate between Costa Rica and Canada.  Ms. Centeno found housing and a school for the children.  She enrolled the children in Precious Blood Catholic School ("PBCS") in Toronto.  Docket No. 34-11 at 1; Docket No. 34-12 at 1.  Mr. Barco assisted Ms. Centeno in enrolling the children in PBCS by providing the school one of the children's certificates of baptism.  Docket No. 41-9 at 1; Docket No. 34-34.

---

[3] Testimony at the hearing suggests that A.B.C. is no longer anemic.  However, Ms. Centeno testified that she has continued to take A.B.C. to the doctor every two to three months.

[4] Mr. Barco testified that F.B.C. has been evaluated in the United States and has been determined to be slightly on the autism spectrum.

At the beginning of June 2023, Ms. Centeno returned to Costa Rica in order to relocate the children to Canada.[5]  Within days of arriving in Canada, F.B.C. visited an orthodontist and A.B.C. visited an ophthalmologist.  The children played video games, visited parks, and attended birthday parties with family friends.  A.B.C. and F.B.C. started attending PBCS on October 2, 2023.[6]  Ms. Centeno did not get off work until after the children had returned from school.  Ms. Centeno's romantic partner, Antonio, and a neighbor took care of the children, until Ms. Centeno got off work.

A.B.C. and F.B.C. were both able to make friends at PBCS and the school was providing services to meet the educational needs of the children.  *See* Docket No. 41-10 at 3 ("I have requested a switch to the mini-bus as F. qualifies.").  However, text messages sent from Ms. Centeno to Mr. Barco on November 13, 2023 indicate that she was frustrated with PBCS and that she believed "[m]y kids are suffering."  Docket No. 41-10 at 1.  On November 14, 2023, Ms. Centeno forwarded to Mr. Barco correspondence from the school indicating that A.B.C. had been punched on the bus.  Docket No. 41-10 at 2–3.  On December 11, 2023, Ms. Centeno sent a text message to Mr. Barco indicating that A.B.C. did not have friends to play with, that he was going through a difficult time, and that A.B.C. and F.B.C. were being bullied.  *See* Docket No. 41-11 at 4.

---

[5] No evidence was introduced as to who cared for the children while they remained in Costa Rica.

[6] Ms. Centeno testified that school at PBCS for the current school year started on September 4, 2024.  No evidence was submitted regarding why the children started school almost a month after the school year started in 2023.

In October 2023, Ms. Centeno and Mr. Barco discussed the children visiting Mr. Barco in Colorado in December.[7]  In November 2023, Ms. Centeno told Mr. Barco that she was going through a situation with Antonio.[8]  Mr. Barco testified that, in November, Ms. Centeno suggested that the children relocate to Colorado to stay with Mr. Barco because of the issues she was having.  However, Mr. Barco also testified that he and Ms. Centeno agreed that the children should travel to Colorado and that no return date was specified.  Ms. Centeno testified that she never intended for the children to move to Colorado, but believed that it was appropriate for the children to visit their father.  In text messages sent from Ms. Centeno to Mr. Barco on December 1, 2023, Ms. Centeno states that "I am going to separate and I need to look for a good place" and "they will be better there with you while I find a place."  Docket No. 41-10 at 4.  From these texts, the Court finds that it was Ms. Centeno's intent in early December 2023 to end her relationship with Antonio, with whom she was having problems, and that she believed that it would be better for the children to visit Mr. Barco while she found a new residence.  The Court finds that Mr. Barco and Ms. Centeno did not discuss or agree upon a return date for the children's trip to Colorado, but that Ms. Centeno agreed that

---

[7] Text messages between the parties suggest that Mr. Barco requested to see one of the children in September 2023, but Ms. Centeno told Mr. Barco that this would not be possible because the children would be starting school soon.  Docket No. 41-4 at 1.  Mr. Barco requested that the child visit him for spring break, and Ms. Centeno responded "[w]e'll see." *Id.*

[8] At the hearing, the parties repeatedly referred to issues Ms. Centeno had with her partner Antonio.  Testimony at the hearing and text messages between the parties refer to the fact that Ms. Centeno was having problems in December 2023.  No evidence was introduced as to the nature of the issues between Ms. Centeno and Antonio.

the children could travel to Colorado to visit Mr. Barco.  Ms. Centeno secured ninety-day visas for the children to travel to the United States.

On December 16, 2023, Mr. Barco drove with his mother from Denver to the border of Canada near Niagara Falls in order to meet the children.  Because Mr. Barco is not permitted to leave the United States without jeopardizing his status as a refugee, his mother crossed into Canada and escorted the children across the border to the United States.  Mr. Barco, his mother, and the children drove back to Denver, arriving on December 17 or December 18, 2023.

When the children arrived in the United States, they were underweight.  Mr. Barco took F.B.C. to the dentist, where it was determined that F.B.C. required the extraction of several teeth due to open cavities.  *See* Docket No. 37-5; Docket No. 37-6 at 1.  While in Colorado, A.B.C. told Mr. Barco that Antonio did not treat him or F.B.C. well.  In text messages sent from Mr. Barco to Ms. Centeno on December 23, 2023, Mr. Barco related that both F.B.C. and A.B.C. told Mr. Barco that they disliked Antonio. Docket No. 41-11 at 16.  A.B.C. also told Mr. Barco that the children were being bullied at PBCS.  According to Mr. Barco's testimony, after talking with A.B.C. about the children's living circumstances in Canada, Mr. Barco decided that the children should remain with him in Colorado.

Text messages exchanged between the parties on December 23, 2023 demonstrate that the parties' disagreement over whether the children should return to Canada had begun.  Ms. Centeno's December 23, 2023 text messages state that the parties had discussed that the travel to Colorado would take place during a "vacation" and that afterwards the children would return to Toronto.  *Id.* at 18 ("We talked about

them going on vacation . . . .  And they would come back").  Mr. Barco's text messages

back to Ms. Centeno, also on December 23, 2023, state that Ms. Centeno had told Mr.

Barco to keep the children and that she had many problems.  *Id.* ("You told me to keep

them").  Ms. Centeno replied that she had asked Mr. Barco to keep the children

"temporarily" and that she had solved several of her problems.  *Id.* at 18–19 ("But I

already fixe[d] several").  *Id.* at 19.  She said that she had told Mr. Barco to return the

children by January 20, 2024.[9]  *Id.* at 19 ("I told you January 20").

      During the parties' disagreement over when or whether the children should return

to Canada, Mr. Barco made demands, including that Ms. Centeno should no longer

work but rather stay home with the children.  *See* Docket No. 41-11 at 21 (text

messages from Mr. Barco on December 23, 2023 questioning whether Ms. Centeno can

be present for the children and work at the same time).  Ms. Centeno agreed to these

conditions as a way of having her children returned.  Docket No. 42 at 34: 5–9 ("Well,

because he would say, because Francesco would tell me that a woman needs to stay

home at the house and take care of her children.  And so in my desperation, I

responded to every one of his questions by saying yes so that he would return my

children to me.").  At some point, Ms. Centeno proposed that F.B.C. return to Canada,

but that A.B.C. could continue to live in Colorado.  In a text message from Ms. Centeno

---

      [9] Ms. Centeno testified that she had originally told Mr. Barco that the children
needed to return to Canada by January 8.  After Mr. Barco told her that he would not
return the children, she told Mr. Barco that the children needed to return by January 20
because the children would have been out of school for approximately one month at
that time.  Text messages sent from Ms. Centeno to Mr. Barco on January 1, 2024
indicate that Ms. Centeno told Mr. Barco that he must return the children to Canada by
"Saturday the 13th, since they go back to school on January 3rd, and obviously I don't
want them to miss the school year."  Docket No. 41-12 at 2.

to Mr. Barco on December 23, 2023, Ms. Centeno states "Francesco, you want to help,
educate" A.B.C. "[a]nd give [F.B.C.] back to me." Docket No. 41-11 at 23. The Court
finds Ms. Centeno's testimony credible that her proposal that F.B.C. return to Canada
while A.B.C. stayed in Colorado was made in response to Mr. Barco's increasing
demands regarding the circumstances under which he would let the children return to
Canada, and was her attempt to persuade Mr. Barco to allow at least one of the two
children to return to Canada.

However, Mr. Barco did not return either A.B.C. or F.B.C. to Canada. Before
August 20, 2024, Mr. Barco lived with the children in Aurora, Colorado. On August 20,
2024, Mr. Barco, A.B.C., and F.B.C. moved to a new residence in Littleton, Colorado.
A.B.C. and F.B.C. currently attend schools in the Littleton public school system. F.B.C.
has seen a dentist in Colorado, who treated his cavities.

On February 8, 2024, Ms. Centeno filed applications with Canadian authorities
and with the United States Department of State for the return of the children to Canada.
Docket No. 34-1; Docket No. 34-2. On June 11, 2024, Ms. Centeno filed her petition in
this Court.[10] Docket No. 1. Pursuant to 22 U.S.C. § 9004 and the Hague Convention,
Ms. Centeno requests that the Court order Mr. Barco to immediately return the children
to Canada for the appropriate resolution of the parties' custody dispute.[11] *Id.* at 7–8,
¶¶ 41–42.

---

[10] Ms. Centeno's filing is titled as a "Complaint and Petition for Return of
Children." Docket No. 1 at 1. ICARA refers to such filings as petitions and the Court
will do the same. 22 U.S.C.A. § 9003(b).
    [11] At the hearing, Ms. Centeno also requested that the Court order Mr. Barco to
return the children's Italian passports to Ms. Centeno.

II.    **ANALYSIS**

    A.  **Petitioner's _Prima Facie_ Case**

To establish wrongful retention, Ms. Centeno must make a *prima facie* case consisting of three elements: (1) her children habitually resided in Canada at the time of the retention, (2) such retention breached Ms. Centeno's custody rights under the law of Canada, and (3) Ms. Centeno was exercising those rights at the time of retention.  *See Livingstone*, 2023 WL 8524922, at *1; *see also* 22 U.S.C. § 9003(e)(1).  Ms. Centeno has the burden to prove that her children have been wrongfully retained within the meaning of the convention by a preponderance of the evidence.  22 U.S.C. § 9003(e)(1)(A).

    *1.  Habitual Residence*

        a.  **Meaning of "habitual residence"**

"The Hague Convention does not define the term 'habitual residence.'"  *Monasky v. Taglieri*, 589 U.S. 68, 76 (2020); *see also Pope ex rel. T.H.L-P v. Lunday*, 835 F. App'x 968, 971 (10th Cir. 2020) (unpublished); *Holder v. Holder*, 392 F.3d 1009, 1015 (9th Cir. 2004).  The Supreme Court in *Monasky* held that a "child 'resides' where she lives.  Her residence in a particular country can be deemed 'habitual,' however, only when her residence there is more than transitory."  *Monasky*, 589 U.S. at 76 (citation omitted).  "The place where a child is at home, at the time of removal or retention, ranks as the child's habitual residence."  *Id.*  "[L]ocating a child's home is a fact-driven inquiry," in which "courts must be sensitive to the unique circumstances of the case and informed by common sense."  *Id.* at 78 (internal quotation marks omitted).  In *Monasky*, the Court rejected any "categorical requirements for establishing a child's habitual residence."  *Id.* at 80.  Accordingly, "[b]ecause children, especially those too young or otherwise unable

to acclimate, depend on their parents as caregivers, the intentions and circumstances of caregiving parents are relevant considerations.  No single fact, however, is dispositive across all cases."  *Id.* at 78.  Ultimately, the question is, "[w]as the child at home in the particular country at issue?"  *Id.* at 84.

Before *Monasky*, courts would generally first "inquire into the shared intent of those entitled to fix the child's residence (usually the parents) at the latest time that their intent was shared."  *Gitter v. Gitter*, 396 F.3d 124, 134 (2d Cir. 2005); *see also Ruiz v. Tenorio*, 392 F.3d 1247, 1250 (11th Cir. 2004) (en banc); *Smith v. Smith*, 976 F.3d 558, 561 (5th Cir. 2020) ("Before *Monasky*, the Fifth Circuit adopted an approach that looked to the parents' 'shared intent' as a threshold test for determining a child's habitual residence.").

*Monasky*, however, explained that, "if the parents' actual agreement on where to raise their child were necessary to establish a habitual residence, that 'would create a presumption of no habitual residence for infants, leaving the population most vulnerable to abduction the least protected.'"  *Pope*, 835 F. App'x at 970–71 (quoting *Monasky*, 589 U.S. at 81).  Therefore, "a wide range of facts other than an actual agreement, including facts indicating that the parents have made their home in a particular place, can enable a trier to determine whether an infant's residence in that place has the quality of being 'habitual.'"  *Monasky*, 589 U.S. at 81.  A court also considers "where a child has lived, the length of time there, [and] acclimatization."  *Grano v. Martin*, 821 F. App'x 26, 27 (2d Cir. 2020) (unpublished) (citing *Monasky*, 589 U.S. at 81).  Acclimatization is the inquiry "whether the evidence unequivocally points to the conclusion that the child has acclimatized to the new location and thus has acquired a new habitual residence."

*Gitter*, 396 F.3d at 134; *see also Hofmann v. Sender*, 716 F.3d 282, 291–92 (2d Cir. 2013).

While shared intent is relevant, it is not dispositive. *Dumitrascu on behalf of A.M.B.D. v. Dumitrascu*, No. 21-cv-01813-PAB, 2021 WL 4197378, at *5 (D. Colo. Sept. 15, 2021), *aff'd*, 2022 WL 1529624 (10th Cir. May 16, 2022). It is not always easy to determine the parent's shared intent. "Difficulty arises, of course, when the persons entitled to fix the child's residence no longer agree on where it has been fixed – a situation that, for obvious reasons, is likely to arise in cases under the Convention." *Mozes v. Mozes*, 239 F.3d 1067, 1076 (9th Cir. 2001), *abrogated on other grounds by Monasky*, 589 U.S. at 83–85. "In these cases, the representations of the parties cannot be accepted at face value, and courts must determine from all available evidence whether the parent petitioning for return of a child has already agreed to the child's taking up habitual residence where it is." *Id.*

Where the family has "manifested a settled purpose to change habitual residence," *Mozes* suggests that a court should find that the child's habitual residence has been changed, but where "the child's initial translocation from an established habitual residence was clearly intended to be of a specific, delimited period," then the habitual place of residence should not be found to have changed, unless that period of time is "too long to expect children to live abroad without acquiring habitual residence." *Id.* at 1076–77 & n.27.

In addition, where the parents intend that a child's relocation is conditional, such intent should not be deemed their last shared intent if the condition is not met. *See Mota v. Castillo*, 692 F.3d 108, 115 (2d Cir. 2012). If only one party has a conditional

intent to relocate, "it cannot be said the parents 'shared an intent.'"  *See id.*; *see also*
*Gitter*, 396 F.3d at 135 (finding no clear error in district court's determination that Israel
was not habitual residence where respondent relocated "on a conditional basis –
namely, that [respondent] would be satisfied with the new arrangements"); *Calixto v.
Lesmes*, 909 F.3d 1079, 1089–90 (11th Cir. 2018) (holding, when "a parent's relocation
with a child from one country to another [is] conditioned upon the occurrence of certain
events, [ ] the first country [] remain[s] the child's habitual residence if those events did
not come to pass").

The Tenth Circuit has made clear that, as part of its habitual residency analysis,
"[t]he Convention does not require a district court to determine *where* a child habitually
resides.  Instead, the Convention requires a district court to determine *whether* the child
habitually resides in the location that the petitioner claims."  *Watts v. Watts*, 935 F.3d
1138, 1147–48 (10th Cir. 2019); *Pope*, 835 F. App'x at 970.

### b. Where was A.B.C. and F.B.C.'s habitual residence at the time of their retention?

In this case, the parties dispute whether Canada or the United States was the
children's habitual residence at the time of their retention.  The Court first looks to the
parties' intent, among other factors.  Keeping the admonition of *Monasky* in mind about
not applying categorical tests, the Court nevertheless finds that an analysis of the
parties' intent as to the residence of the children helpful here.  The Court will analyze
the parties' intent at the time the children were sent to Colorado and will then consider
whether the intent of the parties had changed by the time the children were retained.

The Court finds that, before the parties' discussions regarding the children's
travel to visit their father in October 2023, it was the parties' shared intent for the

children to live with Ms. Centeno in Toronto, Canada.  Ms. Centeno spent several

months preparing for the children to move to Canada on a permanent basis, enrolling

the children in a private school.  Mr. Barco assisted in the enrollment process.  He

provides no evidence that he objected to the children's relocation to Toronto.  As such,

the evidence shows that it was the parties' intent before October 2023 for the children to

live in Toronto.

Turning to the parties' intent at the time the children were sent to Colorado, text

messages between the parties indicate that the parties first considered having the

children travel to see Mr. Barco during their school's spring break, rather than winter

break, which indicates that, since the beginning of the parties' conversations before the

children's departure to Colorado, the Colorado trip had been understood as a temporary

visit that was coordinated around the children's school calendar.  Docket No. 41-4 at 1.

Mr. Barco testified that, when the children traveled to Colorado, he and Ms.

Centeno did not define a return date.  He argues that this evidences an intent for the

children to relocate to Colorado.  However, the fact that he and Ms. Centeno did not

define a return date does not mean that a return date was not presumed.  Nor does a

lack of a return date evidence the parties' intent that the children should live in Colorado

for such a length of time that Colorado was to become the children's habitual residence.

No evidence was admitted suggesting that the children were sent to Colorado with

belongings indicative of a permanent relocation.  For example, the fact that Mr. Barco's

mother was able to escort an eleven-year-old and a six-year-old across the border

without assistance indicates that the children were not traveling with luggage consistent

with a relocation to the United States.  Moreover, there is no evidence that Ms. Centeno

withdrew the children from PBCS before their departure.  Rather, Ms. Centeno testified

that, to date, PBCS expects the children to return to the school.  In fact, Mr. Barco

testified that travel plans to return to Colorado were constrained by the parties' lack of

funds for such travel.  This testimony is consistent with Mr. Barco's contemplation that

the children would return to Toronto.  The Court finds that, at the time the children left

for the trip to Colorado, there was no shared, settled intention between Ms. Centeno

and Mr. Barco for the children to permanently live in Colorado.  *See Mozes*, 239 F.3d at

1077 (citing *Pesin v. Rodriguez*, 77 F. Supp. 2d 1277, 1285 (S.D. Fla. 1999) (settled

purpose of family trip was a vacation of finite duration)); *In re Morris*, 55 F. Supp. 2d. at

1159 (when family left Colorado for school-year teaching appointment in Switzerland,

the parties had a "shared, settled intention to return to Colorado with the child," and

mother's unilateral change of position could not make Switzerland the habitual

residence); *Freier v. Freier*, 969 F. Supp. 436, 438 (E.D. Mich. 1996) (when mother left

with child, she informed father that she would be vacationing with parents for one

month); *Flores v. Contreras*, 981 S.W.2d 246, 248 (Tex. App. 1998) (mother brought

child to Texas for two-week vacation); *Brennan v. Cibault*, 227 A.D.2d 965, 965 (N.Y.

App. Div. 1996) (mother agreed that child should remain with father in New York for six

months, but expected her to return to France on a specific date).

Mr. Barco testified that, in the months before the children came to the United

States and shortly after they arrived in Colorado, Ms. Centeno suggested that it might

be better for the children if they remained with Mr. Barco.  Mr. Barco testified that Ms.

Centeno was concerned about the problems she faced in Canada and about the

children's social difficulties at school.  However, the Court does not credit Mr. Barco's

testimony that the parties ever shared an intent that the children should remain in Colorado. Ms. Centeno testified that her practice was to keep Mr. Barco informed of the children's well-being. The Court does not find that Ms. Centeno's decision to inform Mr. Barco of the challenges she and the children faced while starting a new life in Canada is evidence of an intent for the children to relocate to Colorado. Text messages indicate that Ms. Centeno allowed the children to travel over winter break, in part, as a means of allowing her to resolve problems she was having, such as "separat[ing]" and finding a new residence. Docket No. 41-10 at 4. However, these text messages do not suggest that Ms. Centeno was unable to care for her children due to these problems or that she intended for the children to move permanently to the United States. Additionally, Mr. Barco repeatedly testified that it was not until after Mr. Barco's conversations with A.B.C. in Colorado that Mr. Barco determined it was in the best interest of his children for them not to return to Canada.

Finally, the Court credits Ms. Centeno's testimony that any statements she made to Mr. Barco about quitting work and requesting only one child to be returned to Canada were made as a pressured response to Mr. Barco's refusal to return the children and do not reflect a shared intent for either child to live in Colorado permanently. The Court finds that these facts support the Court's conclusion that the parties' shared intent before the children left to visit Mr. Barco was to have the children return to Toronto.

Mr. Barco has produced no credible evidence that the parties' shared intent changed after the children arrived in Colorado. Rather, Mr. Barco changed his mind. The fact that Mr. Barco changed his mind is not sufficient to show that the shared intent of the parties changed. As the Ninth Circuit has noted, "where the child's initial

16

translocation from an established habitual residence was clearly intended to be of a specific, delimited period," "courts have generally refused to find that the changed intentions of one parent led to an alteration in the child's habitual residence." *Mozes*, 239 F.3d at 1077.

While the parties' shared intent was for the children to return to Canada, shared intent is not dispositive of habitual residence, *see Monasky*, 589 U.S. at 80, and there are no "categorical requirements" for determining habitual residence. *See id.*; *see also Pope*, 835 F. App'x at 970–71 (actual agreement is not necessary for habitual residence). Rather, because determining habitual residence is a "fact-driven inquiry," the Court must consider other evidence to determine whether a child's "residence in that place has the quality of being 'habitual.'" *Monasky*, 589 U.S. at 78–81.

Ms. Centeno's testimony at the hearing established that she had made her home in Toronto. She testified that she moved to Toronto at the beginning of 2022. Ms. Centeno obtained employment as a construction painter and found housing and a school for her children. Ms. Centeno bought the children toys, clothing, and mattresses. During this time, the children were still in Costa Rica. The children joined Ms. Centeno in Toronto in June 2023. While in Toronto, the children attended school and received accommodations for their different abilities. The children began receiving medical care and dental care. While it is true that the children only spent six months in Canada before they left for Colorado, other courts have found that similar periods of residency were sufficient for a country to become the habitual residence. *See Johnson v. Johnson*, 669 F. Supp. 3d 1089, 1102 (D. Colo. 2023) (finding that residency from August to December was sufficient to establish new habitual residency); *Watts*, 935

F.3d at 1144–47 ("We acknowledge that courts have found a child to have acclimatized

in as little as six months." (citing *Feder v. Evans-Feder*, 63 F.3d 217, 224 (3d Cir.

1995)).  Although A.B.C. and F.B.C. faced difficulty making friends in Canada, these

facts alone do not suggest that Canada did not have the quality of being habitual even if

the children experienced issues, such as bullying, common to immigrants, especially

immigrant children with certain special needs.[12]

       Mr. Barco testified that the children's habitual residency has changed and that

they are presently habitual residents of Colorado.  However, whether the children's

current habitual residency is Colorado is irrelevant.  Under the Hague Convention, the

Court looks to the habitual residency of the children "at the time of removal or retention."

Hague Convention, art. 3.  As such, the Court must determine the children's habitual

residency "at the time of the allegedly wrongful retention."  *Navani*, 496 F.3d at 1131;

*Luis Ischiu v. Gomez Garcia*, 274 F. Supp. 3d 339, 346 (D. Md. 2017); *Diaz Arboleda v.

Arenas*, 311 F. Supp. 2d 336, 341 (E.D.N.Y. 2004); *see also Pfeiffer v. Bachotet*, 913

F.3d 1018, 1024 (11th Cir. 2019) ("We conclude, based on the second requirement, that

the children's habitual residence had not changed as of the date of the challenged

removal.").

       In close cases, some courts have found that the date of retention began when

the retaining party expressed an unequivocal intent not to return the child.  *Slagenweit*

*v. Slagenweit*, 841 F. Supp. 264, 268 (N.D. Iowa 1993), *dismissed,* 43 F.3d 1476 (8th

---

[12] Neither party argues that the children had not acclimatized to Canada at the
time of their translocation, such that Costa Rica was their habitual residence.  *Watts*,
935 F.3d at 1147–48 (courts need not determine where the children's state of habitual
residence, in fact, was at the time of their retention).

Cir. 1994) ("It is somewhat unclear as to when the wrongful retention began. . . .
However, by March 31, 1993, when the divorce petition was filed, it was clear to all
concerned that it was Steven's intent to keep Sandra on a permanent basis.  The court
will adopt the petitioner's argument that the date for measuring when the wrongful
retention began is March 31, 1993.").  Other courts have tried to determine the earliest
possible moment that the retention became wrongful.  *See*, *e.g.*, *Falls v. Downie*, 871 F.
Supp. 100, 102 (D. Mass. 1994) ("The first time that the conduct of the respondent in
this case could conceivably be characterized as 'wrongful,' would be in August of 1994
when Falls asked to take Patrick back to Germany and Downie refused to let him go.
The petitioner bears the burden of proving by a preponderance of the evidence that
Patrick *at that time* was a 'habitual resident' of Germany.").  Here, the evidence shows
that Mr. Barco expressed his intent not to return the children on December 23, 2023.
Nevertheless, as evidenced by the text messages between the parties and Ms.
Centeno's testimony, Ms. Centeno agreed to allow the children to remain in Colorado
until January 20, 2024.  However, Mr. Barco did not return the children to Canada after
January 20, 2024.  The Court finds that the date of wrongful retention is January 20,
2024, as this date is the first time Mr. Barco's retention of the children in this case can
be characterized as wrongful.[13]  *See Falls*, 871 F. Supp. at 102.

Mr. Barco asserts that the habitual residence of the children at the time of
retention was Colorado.  Given that the Court has determined that, at the time the

---

[13] Ms. Centeno testified that the original return date for the children was January
8, 2024, and suggests that she may have agreed to an extension of time only as a
concession made to Mr. Barco's demands.  However, the evidence shows that Ms.
Centeno agreed to allow the children to remain in Colorado until January 20, 2024 and
the Court will use this date as the date of wrongful retention.

children traveled to Colorado, their habitual residence was Canada and that the shared intent of the parties did not change between the date of departure and the date of retention, Mr. Barco appears to argue that, nevertheless, Colorado gained the "quality of being 'habitual'" by the time he retained the children.  *Monasky*, 589 U.S. at 81.

As of January 20, 2024, the children had spent only a month in Colorado.  The children left Canada on December 16, 2023.  Although there was no testimony as to when the children started school in Colorado, it is reasonable to assume that they would not have started school until after the holiday break.  Considering that the children had traveled away from their primary care provider to a country they had never visited in order to spend time with their father, who they had not seen in five years, the Court finds that the United States had not become the children's habitual residence in a single month.  *Monasky*, 589 U.S. at 78 ("locating a child's home is a fact-driven inquiry," in which courts must be "informed by common sense").

The Court concludes that Ms. Centeno has shown by a preponderance of the evidence that the children's habitual residence at the time of their retention was Toronto, Canada.

### 2.  *Petitioner's Custody Rights*

The second element of the *prima facie* case is a breach of the petitioning parent's custody rights.  "[C]ustody of a child entails the primary duty and ability to choose and give sustenance, shelter, clothing, moral and spiritual guidance, medical attention, education, etc., or the (revocable) selection of other people or institutions to give these things."  *Croll v. Croll*, 229 F.3d 133, 138 (2nd Cir. 2000), *abrogated on other grounds by Abbott v. Abbott*, 560 U.S. 1 (2010); *see also Furnes v. Reeves*, 362 F.3d 702, 716 (11th Cir. 2004) ("The right to determine a child's language, nationality, and

20

cultural identity is plainly a right relating to the care of the person of the child within the meaning of the Convention") (internal quotations omitted), *abrogated on other grounds by Lozano v. Montoya Alvarez*, 572 U.S. 1 (2014).

The parent need not have sole or even primary custody to have rights under the Convention. *Furnes*, 362 F.3d at 715. "In analyzing whether a parent has custodial rights under the Hague Convention, it is crucial to note that the violation of a single custody right suffices to make removal of a child wrongful. That is, a parent need not have 'custody' of the child to be entitled to return of his child under the Convention; rather; he need only have one right of custody." *Id.* While many courts have placed particular emphasis on a parent's right to determine the child's place of residence when examining whether a parent has rights of custody, the Convention also states that "rights of custody" shall include rights relating to the care of the child. *See Lieberman v. Tabachnik*, 625 F. Supp. 2d 1109, 1118 (D. Colo. 2008); Hague Convention, art. 5(a) (defining "rights of custody" as "relating to the care of the person of the child and, in particular, the right to determine the child's place of residence"). When no formal custody agreement exists between the parents, the Court must apply the laws of the country of the child's habitual residence to determine if the non-removing parent had "rights of custody" within the meaning of the Convention. *See, e.g.*, *Sealed v. Sealed*, 394 F.3d 338, 343 (5th Cir. 2004). "The Convention is very clear that the law of the country in which the child was habitually resident governs decisions as to whether custody rights existed at the time of removal." *Shealy*, 295 F.3d at 1124; *Abou-Haidar v. Sanin Vazquez*, 945 F.3d 1208, 1215 (D.C. Cir. 2019) (courts conduct a four-part inquiry, including, "[d]id the removal or retention breach the rights of custody attributed

to the petitioner under the law of the habitual residence?").  Because the Court has found that the children's habitual residence is Toronto, Canada, the Court looks to Canadian law.

As Ms. Centeno pointed out at the hearing, Canadian law defines custody as "decision-making responsibility."  Children's Law Reform Act, R.S.O. 1990, c C.12(18)(5) (Can.) ("Unless the context requires otherwise, a reference in an Act or regulation to custody of a child, including lawful custody or legal custody of a child, includes reference to decision-making responsibility with respect to the child under this Act.").  Decision-making authority is in turn defined as "responsibility for making significant decisions about a child's well-being, including with respect to, (a) health, (b) education, (c) culture, language, religion and spirituality, and (d) significant extra-curricular activities."  R.S.O. 1990, c C.12(18)(1).  This is in contrast to individuals who have to entitlements to "parenting time," which is defined as "the time a child spends in the care of a parent of the child, whether or not the child is physically with the parent during that time," and "includes the right to visit with and be visited by the child, and includes the same right as a parent to make inquiries and to be given information about the child's well-being, including in relation to the child's health and education."  R.S.O. 1990, c C.12(18)(1), (20)(5).

Ms. Centeno testified that she had enrolled her children in PBCS and that it was her intention that the children return to school after the winter break.  Moreover, evidence from the hearing showed that she had been providing for the children's medical and dental needs prior to their travel to Colorado.  More importantly, Ms. Centeno had been the children's only caretaker in Toronto since the time the children

moved to Canada.  In each of these instances, Ms. Centeno was exercising her decision-making authority regarding the children's well-being, which is a custody right under Canadian law.  R.S.O. 1990, c C.12(18)(1).  The children's retention in Colorado interfered with this custody right.

Finally, as Ms. Centeno points out, under Canadian law, "if the parents of a child live separate and apart and the child lives with one of them with the consent, implied consent or acquiescence of the other, the right of the other to exercise the entitlement to decision-making responsibility with respect to the child, but not the entitlement to parenting time, is suspended until a separation agreement or order provides otherwise." R.S.O. 1990, c C.12(20)(4).  Canadian law recognizes that the parties may enter into a separation agreement that amends this default rule, but there was no evidence that Ms. Centeno and Mr. Barco have entered into a separation agreement.  *Id.*  The Court notes that the issue is not whether Mr. Barco also had custodial rights, but only whether Ms. Centeno had custodial rights that were violated at the time of the retention.  The Court finds Canadian law regarding the default rule for parents living separately to be persuasive evidence that Ms. Centeno was exercising decision-making responsibility over the children under Canadian law.  Given that Mr. Barco and Ms. Centeno have lived separate and apart for five years and the children did not live with Mr. Barco during this time, this provision of Canadian law suggests that Ms. Centeno was the only parent who had decision-making authority and, therefore, custodial rights under the Hague Convention, over the children at the time they were retained in Colorado.

Canadian law further provides for the circumstances under which a parent may relocate a child.  Canadian law defines "relocation" as "a change in residence of a child,

or of a person who has decision-making responsibility or parenting time with respect to the child or is an applicant for a parenting order in respect of the child, that is likely to have a significant impact on the child's relationship with, (a) another person who has decision-making responsibility or parenting time with respect to the child or is an applicant for a parenting order in respect of the child." R.S.O. 1990, c C.12(18)(1). Mr. Barco's decision to retain the children in Colorado was a relocation of the children because it has had a significant impact on the children's relationship with Ms. Centeno. Canadian law requires that, for such a relocation to be authorized, Mr. Barco must provide Ms. Centeno sixty days prior notice, at which point Ms. Centeno may object within thirty days of receiving such notice. R.S.O. 1990, c C.12(39.3)(1), (5). The law states that a "person who has given notice of a proposed relocation in accordance with section 39.3 and who intends to relocate a child may do so as of the date referred to in the notice if, (a) the relocation is authorized by a court; or (b) no objection to the relocation is made in accordance with subsection 39.3 (5) and there is no order prohibiting the relocation." R.S.O. 1990, c C.12(39.4)(2).

Here, the evidence shows that none of the requirements for an authorized relocation have occurred. The Court has found that Mr. Barco's wrongful retention of the children began on January 20, 2024. Mr. Barco did not comply with the sixty-day notice requirement, which would have required that he give notice to Ms. Centeno by November 20, 2023. There is no evidence that Mr. Barco had received authorization from a Canadian court to relocate the children to Colorado. Therefore, the Court finds that Mr. Barco's retention of the children breached Ms. Centeno's custody rights under Canadian law.

### 3. Petitioner's Exercise of Custody Rights

The third prong of the *prima facie* case is that the petitioner was exercising her custody rights at the time of the wrongful retention. "[A] person cannot fail to 'exercise' [her] custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child. Once it determines that the parent exercised custody rights in any manner, the court should stop – completely avoiding the question whether the parent exercised the custody rights well or badly." *In re Application of Stead v. Menduno*, 77 F. Supp. 3d 1029, 1035 (D. Colo. 2014) (citing *Friedrich v. Friedrich*, 78 F.3d 1060, 1066 (6th Cir. 1996)). The evidence confirms that Ms. Centeno was exercising her custody rights under Canadian law before her children were wrongfully retained. At the time of the retention, Ms. Centeno was the primary care provider for her children. Moreover, Ms. Centeno had enrolled them in PBCS, and it was her intent for her children to return to PBCS after winter break. *Croll*, 229 F.3d at 138 ("custody of a child entails the primary duty and ability to choose and give sustenance, shelter, clothing, moral and spiritual guidance, medical attention, education, etc.").

Considering whether Ms. Centeno abandoned her children, Ms. Centeno has continued to attempt to exercise her custodial rights since the children were retained. Ms. Centeno filed petitions for the return of the children with authorities in Canada and the United States on February 8, 2024, less than three weeks after the wrongful retention began. Docket No. 34-1; Docket No. 34-2. She has also tried to maintain contact with her children through frequent video calls, text messages, and emails. Ms. Centeno filed a temporary restraining order in this case, petitioning the Court to order

Mr. Barco not to interfere with such communication.[14]  Docket No. 10.  Mr. Barco does

not contest that Ms. Centeno was exercising custody rights, and the Court identifies no

evidence of "clear and unequivocal abandonment."  *See Friedrich*, 78 F.3d at 1066.

The Hague Convention provides that retention of a child is wrongful if, at the time

of retention, a parent was either exercising her custodial rights or if those rights "would

have been so exercised but for the removal or retention."  Hague Convention, art. 3(b).

Ms. Centeno argues, and the Court agrees, that the evidence shows that Ms. Centeno

intended to resume her role as the children's caregiver upon their return to Canada.

For the foregoing reasons, the Court finds that Ms. Centeno has satisfied her

*prima facie* case under the Hague Convention.

### B. <u>Respondent's Defenses</u>

Having determined that Ms. Centeno has met her burden, the Court now

considers whether any of the four possible exceptions or defenses apply.  Courts have

held that such exceptions must be narrowly construed.  *See West*, 735 F.3d 929; *Avila*

*v. Morales*, No. 13-cv-00793-MSK-MEH, 2013 WL 5499806, at *13 (D. Colo. Oct. 1,

2013) (citing *Tsai-Yi Yang v. Fu-Chiang Tsui*, 499 F.3d 259, 277 (3d Cir. 2007)).  Two of

the available defenses must be established by a preponderance of the evidence: (1) the

proceeding was commenced more than one year after the child's retention and the child

has become settled in her new environment, *see* Hague Convention, art. 12; or (2) the

parent seeking return of the child either consented to or subsequently acquiesced in the

retention.  *See* Hague Convention, art. 13; *see Gil-Leyva*, 2018 WL 10322064, at *4

---

[14] The Court found that a temporary restraining order was not necessary in this
case because Mr. Barco stipulated to the relief requested in Ms. Aguirre's motion.  *See*
Docket Nos. 18, 24.

(citing *Crane v. Merriman*, 2017 WL 4079406, at *5 (W.D. Okla. Sept. 14, 2017)). The other two defenses require proof by clear and convincing evidence: (3) there is a grave risk that the return of the child would expose the child to physical or psychological harm, *see* Hague Convention, art. 13(b); or (4) "the return of the child[] would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms." *See Gil-Leyva*, 2018 WL 10322064, at *4 (citing Hague Convention, art. 20); *Crane*, 2017 WL 4079406, at *5. The only defense Mr. Barco raises is that Ms. Centeno consented to or subsequently acquiesced in the retention. Nevertheless, the Court will briefly consider the first three defenses. The Court does not consider the last defense, which is called the public policy defense, because "it is so rarely invoked that it is considered to have 'nearly faded without a trace.'" *See Filho v. de Albuquerque*, No. 20-cv-01421-RBJ, 2020 WL 9455201, at *7 (D. Colo. Aug. 21, 2020) (quoting Beaumont, P.R. & McEleavy, P.E., *The Hague Convention on International Child Abduction* 172 (1999)).

### 1. Well-Settled

The "now-settled" or "well-settled" defense is found in Article 12 of the Convention, which states, in relevant part, that the Court, "even where the proceedings have been commenced after the expiration of the period of one year . . . , shall also order the return of the child, unless it is demonstrated that the child is now settled in its new environment." Hague Convention, art. 12. This defense "is applicable only if more than one year has elapsed from the wrongful removal before the date of commencement of these proceedings." *In re Robinson*, 983 F. Supp. 1339, 1344–45 (D. Colo. 1997). *Robinson* held that proving this defense requires "substantial evidence of the child's significant connections to the new country." *Id.* at 1344 (quoting *Hague*

27

*International Child Abduction Convention; Text & Legal Analysis*, 51 Fed. Reg. 10509).

There are, therefore, two relevant factors to this defense – the passage of time and the

age of the child, i.e., whether the child is old enough to develop meaningful connections

to the new environment. *Id.* at 1345–46.

The children were wrongfully retained on January 20, 2024, and Ms. Centeno

filed her petition on June 11, 2024. Docket No. 1. Therefore, less than one year

passed between the retention and the start of the proceedings in this case.

### 2. *Consent or Acquiescence*

Article 13(a) of the Convention provides that the Court is not bound to order the

return of the child if Ms. Centeno "consented to or subsequently acquiesced in the

removal or retention." Hague Convention, art. 13. Mr. Barco bears the burden to prove

that Ms. Centeno consented or acquiesced by a preponderance of the evidence. 22

U.S.C. § 9003(e)(2)(B). This exception can apply where the record reflects "a

consistent attitude of acquiescence over a significant period of time." *Friedrich*, 78 F.3d

at 1070; *Filho*, 2020 WL 9455201, at *8; *Mendez Lynch v. Mendez Lynch*, 220 F. Supp.

2d 1347, 1358 (M.D. Fla. 2002) (rejecting authorization to travel to the United States for

vacation as "consent").

Mr. Barco argues that, at the time the children were sent to the United States,

there was no definite return date and that, therefore, Ms. Centeno's consent was

effectively unconditional. As such, Mr. Barco maintains that she consented to the

children's retention in the United States. The Court disagrees. The record shows that

Ms. Centeno intended that her children visit their father for a short period of time and

intended that they return to Canada after the boys' winter break. Consenting to the

children's temporary travel is insufficient to show that Ms. Centeno consented to the

children's permanent removal from Canada.  *See Mendez Lynch*, 220 F. Supp. 2d at

1358; *Avendano v. Smith*, 2011 WL 5223041, at *9 (D.N.M. Oct. 6, 2011) ("in examining

a consent defense, a court should consider what the petitioner actually contemplated

and to what the parties agreed in allowing the child to travel outside his or her home

country"); *Baxter v. Baxter,* 423 F.3d 363, 371 (3d Cir. 2005) ("The nature and scope of

the petitioner's consent, and any conditions or limitations, should be taken into account.

The fact that a petitioner initially allows children to travel, and knows their location and

how to contact them, does not necessarily constitute consent to removal or retention

under the Convention."); *Fabri v. Pritikin–Fabri,* 221 F.Supp.2d 859, 871–72 (N.D. Ill.

2001) ("Many cases begin with a parent's taking the child away from home for a

vacation or visit with the consent of the other parent, but nevertheless result in a Hague

Convention order compelling the child's return.").  The Court finds Mr. Barco's testimony

that, at unspecified times, Ms. Centeno expressed a desire for the children to stay with

him or that she agreed to allow A.B.C. to remain in Colorado is insufficient to meet his

burden of showing by a preponderance of the evidence that Ms. Centeno consented or

acquiesced to the children's retention.  Rather, the Court finds that any suggestions by

Ms. Centeno that A.B.C. remain in Colorado were made under the duress of Mr. Barco

refusing to return either child to Toronto.

### 3.  Grave Risk

The grave risk defense provides that a child wrongfully removed from his habitual

residence or retained should not be returned where there is a grave risk that the return

would expose the child to physical or psychological harm or "otherwise place the child in

an intolerable situation."  *Gil-Leyva*, 2018 WL 10322064, at *5; *West*, 735 F.3d at 931.

"Grave risk" requires a "severe . . . level of risk and danger."  *Livingstone*, 2023 WL

8524922, at *2 (quoting *West*, 735 F.3d at 931).  The Tenth Circuit has noted that the
grave risk exception applies in two primary circumstances.  First, a court should not
return a child to "a zone of war, famine, or disease."  *West*, 735 F.3d at 931 n.8.
Second, a court should not return a child to a place where the child would face "serious
abuse or neglect, or extraordinary emotional dependence when the country of habitual
residence for whatever reason may be incapable or unwilling to give the child adequate
protection."  *Id.* (citing *Baxter*, 423 F.3d at 373; *Blondin v. Dubois*, 238 F.3d 153, 162
(2d Cir. 2001); *Friedrich*, 78 F.3d at 1069).

　　　The first category of grave risk does not apply.  Neither party contends that
Canada is experiencing war, famine, or a disease outbreak that poses a grave risk of
harm to the children.

　　　The second category also does not apply.  There was evidence that the
children's medical and dental needs were not being met in Canada because the
children arrived underweight and F.B.C. had multiple cavities in his teeth.[15]  The Court
finds persuasive the Fifth Circuit's decision in *Galaviz v. Reyes*, 95 F.4th 246, 257–60
(5th Cir. 2024), where the court held that evidence suggesting that, when the children
were brought to the U.S., "the children had 'rotten molars,'" and "were behind on their
vaccinations," as well as evidence that the "daughter had hearing loss requiring hearing
aids, and the[ ] son had an astigmatism requiring eyeglasses," was insufficient to show
a grave risk of harm.  *Id.*  257–59.  This was, in part, because of "unrebutted testimony
that [petitioner] sought and obtained some dental treatment for their son, including

---

[15] The Court notes that there was evidence suggesting the F.B.C. did not receive
dental treatment for his cavities in the United States until July 8, 2024.  *See* Docket No.
37-5.

obtaining crowns for his molars, attending the dentist five times, and asking [respondent] for money for dental treatment." *Id.* at 257. Here, Ms. Centeno's unrebutted testimony was that she was seeking medical and dental care for her children in Canada. *See* Docket No. 34-9 at 1–3; Docket No. 34-10 at 1; Docket No. 34-23. In light of this evidence and the holding in *Galaviz*, the Court finds that the evidence that the children were underweight or had tooth decay is insufficient to show by clear and convincing evidence that the children would face a grave risk of harm if returned to Canada.

Accordingly, the Court finds that no exception applies and that the children should be returned to Canada.

III.    **CONCLUSION**

For the foregoing reasons, it is

**ORDERED** that the Complaint and Petition for Return of Children [Docket No. 1] is **GRANTED**. It is further

**ORDERED** that respondent shall ensure that A.B.C. and F.B.C. are returned to Canada at a location acceptable to petitioner on or before December 15, 2024. It is further

**ORDERED** that, no later than seven days before the date of A.B.C.'s and F.B.C.'s departure for Canada, respondent shall file under level one restriction in this case, D.C.COLO.LCivR 7.2(b), a notice that informs petitioner of the details and date of the children's return to Canada. If respondent returns the children to Canada by making arrangements for the children to fly to Canada, respondent shall include in his notice the details of the flight to Canada and with whom the children may be traveling. It is further

31

**ORDERED** that respondent shall ensure that A.B.C. and F.B.C. travel with their Italian passports and that the passports are delivered to petitioner upon the children's return.  It is further

**ORDERED** that petitioner may file a post-judgment motion for the allocation of costs and expenses consistent with the procedures set forth in Federal Rule of Civil Procedure 54(d)(1) and D.C.COLO.LCivR 54.1.  It is further

**ORDERED** that this case is closed.


DATED November 25, 2024.

BY THE COURT:

PHILIP A. BRIMMER
Chief United States District Judge